UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ZOOMINFO TECHNOLOGIES LLC,<br><br>Plaintiff,<br><br>v.<br><br>SALUTARY DATA LLC,<br><br>Defendant. | Case No. 21-cv-10396-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                    **April 21, 2021**

**I.   Introduction**

Plaintiff ZoomInfo Technologies LLC ("ZoomInfo") has moved for a preliminary injunction against Defendant Salutary Data LLC ("Salutary"), seeking to enjoin Salutary from distributing ZoomInfo's data to third parties. D. 13. Salutary has also moved for injunctive relief seeking to enjoin ZoomInfo from terminating or otherwise breaching the parties' License Agreement (the "Agreement"). D. 9. For the reasons stated below, the Court ALLOWS ZoomInfo's motion for injunctive relief, D. 13, and DENIES Salutary's motion for injunctive relief, D. 9.

**II.  Standard of Review**

The Court recognizes that preliminary injunctive relief "is an 'extraordinary and drastic remedy.'" Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). To obtain such relief, the

1

Court must consider: (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). Likelihood of success on the merits is the "main bearing wall of this framework." W Holding Co. v. AIG Ins. Co.-Puerto Rico, 748 F.3d 377, 383 (1st Cir. 2014) (internal quotation marks omitted) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). Irreparable harm, on the other hand, is measured "on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Gedeon v. City of Springfield, No. 16-cv-30054-MGM, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017) (quoting Braintree Labs., Inc. v. Citigroup Global Mkts., Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)). The plaintiff "bears the burden of establishing that these four factors weigh in [his] favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

### III.  Factual Background

Unless otherwise noted, the following facts are drawn from the amended complaint, D. 8, Salutary's motion for injunctive relief, D. 9, ZoomInfo's motion for preliminary injunction, D. 13, the parties' oppositions, D. 23, D. 25, and the parties' supporting filings.

ZoomInfo is a publicly traded company that helps businesses sell and market their products and services directly to other businesses by providing licensed access to its business-to-business contact database. D. 8 ¶ 1; D. 14 at 6. ZoomInfo's customers pay fees to access the database, with some customers paying hundreds of thousands of dollars per year for access. D. 8 ¶ 5. Salutary is a boutique provider of U.S. business contact records, offering a curated multi-supplier-sourced database of business contact records to its customers. D. 8 ¶ 6; D. 23 at 3-4.

A.      **The Agreement**

In December 2015, Zoom Information Inc., a predecessor-in-interest to ZoomInfo, and Salutary entered into an Agreement permitting Salutary to sublicense ZoomInfo Data to Salutary's own customers ("Customer Subscribers"). D. 8 ¶ 7; D. 17-1. The Agreement defines a "Customer Subscriber" as "an individual or organization provided access to [Salutary's] Products including for use as part of Customer Subscriber lead generation products and services." D. 17-1 at 2; D. 8 ¶ 9. The Agreement was amended five times, D. 8 at 7, and restricts Salutary and the Customer Subscribers' uses of ZoomInfo's data, D. 17-1 at 2-3; D. 8 ¶ 8. ZoomInfo alleges that in violation of Section 2.1 of the Agreement, Salutary entered into numerous agreements with Customer Subscribers that permitted the Customer Subscribers to re-distribute ZoomInfo Data to third parties and did not limit the use of same as required in the Agreement. D. 17-1 at 2-3; D. 8 ¶ 11. Section 2.1 of the Agreement "grants to Customer," Salutary, alone, "a non-exclusive, non-transferable . . . worldwide right for the Term to use, including but not limited to, store, copy, distribute, display, and incorporate the ZoomInfo Data in any manner, form, media or medium in the Customer Products and to make the ZoomInfo Data available to Customer Subscribers, provided, however that [Salutary] and all Customer Subscribers" do not violate the restrictions listed in Section 2.1(a)-(j). D. 17-1 at 2-3. Section 2.1(a) of the Agreement prohibits Salutary or its Customer Subscribers from accessing or reviewing ZoomInfo Data for any purpose "other than their individual, internal company use." Id. at 3. Section 2.1(b) prohibits Salutary or its Customer Subscribers from reproducing, distributing, displaying, selling, publishing, broadcasting or circulating ZoomInfo Data to any third-party, "[e]xcept as expressly set forth" in the Agreement. Id. Section 2.1(h) prohibits Salutary or its Customer Subscribers from modifying, licensing, bartering or selling, "in whole or in part," any content provided by ZoomInfo, "[e]xcept as

expressly set forth" in the Agreement. Id. Section 11.3, however, recognizes that the parties may "market or have under development technologies, products and/or services which are competitive" with those of each other, id. at 7, and notes that "nothing contained [in the Agreement] is intended to impair the right of either Party to develop, make, use, procure and/or market technologies, products or services now or in the future which may be competitive with those offered by the other or those contemplated to be offered pursuant to this Agreement," id.

### B. The Audit and Termination of the Agreement by ZoomInfo

On January 19, 2021, ZoomInfo invoked its audit rights under Section 4.3 of the Agreement, id. at 4, and requested that Salutary provide (1) a complete list of customers and/or third parties to whom Salutary provided ZoomInfo Data; (2) a description of all revenues Salutary received from such customers and/or other third parties in connection with ZoomInfo Data and the basis for the calculation of such revenues; and (3) copies of all contracts between Salutary and any customers and/or other third parties to whom ZoomInfo Data was provided. D. 8 ¶ 12. Salutary refused to provide the names of any of its Subscriber Customers or pricing information. Id. Salutary instead provided redacted customer contracts, D. 14 at 10, which did not restrict the further distribution of ZoomInfo Data, id. at 11.

Pursuant to Section 4.2, ZoomInfo has a unilateral right to terminate the Agreement: "ZoomInfo shall have the right, at its sole discretion, to immediately terminate or suspend the Agreement, without a cure period, if it determines that Customer or any person using the services through Customer's account has violated the provisions of Section 2.1." D. 17-1 at 4. On March 8, 2021, ZoomInfo terminated the Agreement under Section 4.2. D. 8 ¶ 13. Thereafter, ZoomInfo requested that Salutary confirm that it would comply with the termination obligations imposed by Section 4.4. Id. ¶ 14. Pursuant to Section 4.4, upon expiration or termination of the Agreement,

each party shall:  (a) "promptly return to the other all of the Confidential Information of the other Party in its possession or control . . ." (b) "cease all use of the ZoomInfo Marks and ZoomInfo Data," (c) "cease using and making the ZoomInfo Data available to third parties," and (d) "be liable for any unpaid and undisputed fees up to the date of termination."  D. 17-1 at 4.  To date, as alleged by ZoomInfo, Salutary has refused to do so.  D. 8 ¶ 14.

IV.   **Procedural History**

ZoomInfo instituted this lawsuit on March 8, 2021.  D. 1.  On March 17, 2021, both ZoomInfo and Salutary moved for preliminary injunctions.  D. 9; D. 13.  The next day, on March 18, 2021, ZoomInfo filed a motion to expedite discovery.  D. 21.  On April 7, 2021, the Court heard the parties on their respective motions and took the matters under advisement.  D. 30.

V.   **Discussion**

   A.   **Injunctive Relief**

      1.   *Likelihood of Success on the Merits*

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011).

         a)   Breach of Contract

Both Salutary and ZoomInfo rely upon their respective breach of contract claims, contending that each will likely succeed on the merits.  See D. 9 at 1; D. 13 at 1.  Under Massachusetts law, to prove a breach of contract claim, the plaintiff must demonstrate that:  1) "there was an agreement between the parties"; 2) "the agreement was supported by consideration";

3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; 4) "the defendant committed a breach of the contract"; and 5) "the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016). Whether a contract is ambiguous constitutes a question of law for the Court. LPP Mortg. Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009). If a contract term is deemed ambiguous, then the Court may consult extrinsic evidence to deduce the term's meaning. Bank v. International Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998). Ambiguity exists only "where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and the obligations undertaken." Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) (internal quotation marks and alterations omitted). "[A]n ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).

The parties do not dispute that the Agreement is a valid contract. The only dispute is whether Salutary breached the Agreement by, among other things, permitting its Customer Subscribers to resell ZoomInfo Data to end users, in violation of Section 2.1(b), or if ZoomInfo was in breach for terminating the Agreement because Salutary did so. The Agreement only gives Salutary a license to use ZoomInfo Data, Section 2.1 (providing a "non-exclusive, non-transferable . . . worldwide right for the Term to use . . . ZoomInfo Data"), but it provides restrictions upon such use by Salutary and its Customer Subscribers. D. 17-1 at 2.

It is Section 2.1 of the Agreement that grants a license to ZoomInfo Data to Salutary and the same section that places restrictions on the use of that data by Salutary and its Customer Subscribers. Section 2.1(b) of the Agreement prohibits both Salutary and its Customer Subscribers

from reproducing, distributing, selling, publishing, broadcasting or circulating ZoomInfo Data to any third party, "[e]xcept as expressly set forth" in the Agreement. Id. at 3. Salutary argues that it "had the right under 2.1(b) and 2.1(h) to aggregate and resell ZoomInfo's data to its Customer Subscribers notwithstanding Section 2.1(a)," D. 10 at 9, and that because Section 2.1 applies to both Customer and Customer Subscriber uses, the Customer Subscriber should have "a similar right to aggregate and resell ZoomInfo data under a fair construction of Section 2.1, so long as it is 'for use as part of Customer Subscriber lead generation products and services,' as required by Section 1.2, id. Section 2.1(b) and 2.1(h), however, restrict both Salutary and the Customer Subscribers' use to ZoomInfo Data, except as otherwise "expressly set forth" in the Agreement. D. 17-1 at 3. The "[e]xcept as expressly set forth herein" language in Section 2.1(b) and 2.1(h) refers to the license granted to Salutary alone in Section 2.1, which states that ZoomInfo "grants to [Salutary] a non-exclusive, non-transferable . . . worldwide right for the Term to use, including but not limited to, store, copy, distribute, display, and incorporate the ZoomInfo Data in any manner, form media or medium in the Customer Products and to make the ZoomInfo Data available to Customer Subscribers" provided that Salutary and its Customer Subscribers follow the listed restrictions provided in the subsections of Section 2.1. Id. at 2-3. The only use granted (as opposed to restricted) under the subsections of Section 2.1 is Section 2.1(a), which limits access and review of ZoomInfo Data except for "individual, internal use." Id. at 3. None of this language allows Customer Subscribers to sell or distribute ZoomInfo data to third parties.

Salutary's reliance upon the definitions of "Customer Subscriber" and "Customer Products" under the definitions section of the Agreement does not compel a different conclusion or suggest internal inconsistencies in the Agreement. As defined, a Customer Subscriber is provided access to Customer Products (defined as "the [Salutary] product owned [and] operated

by [Salutary] which aggregates U.S. contact data and other released data sets for licensed use," Section 1.1), "including for use as part of Customer Subscriber lead generation products and services," Section 1.2.  Such definitions must be read in conjunction with Section 2.1, which governs the permissible uses of that data by Salutary and its Customer Subscribers.

The terms of the Agreement are not facially inconsistent nor does its phraseology support "reasonable differences of opinion as to the meaning of the words employed and the obligations undertaken." Coll, 50 F.3d at 1122.  Salutary argues that Section 2.1, which solely refers to Salutary when granting a license for access rights, and then refers to both Salutary and the Customer Subscribers when limiting ZoomInfo Data uses, should "be read as applying consistently to both Salutary and Customer Subscribers" in its entirety.  D. 23 at 17.

If, however, the Court were to follow Salutary's reading, portions of Section 2.1(b) and (h) would be rendered unnecessary, as Section 2.1 gives Salutary the right to uses explicitly prohibited by Section 2.1(b) and (h), such as the right to distribute or display ZoomInfo data.  Id. at 2-3.  Given the exception included in Section 2.1(b) and (h)—"except as expressly provided herein"—the Agreement permits Salutary to distribute or display ZoomInfo Data despite the restrictions in Section 2.1(b) and (h), as expressly provided in Section 2.1—"ZoomInfo hereby grants to Customer"—while prohibiting others from doing so, given no other expressly stated exception in the Agreement.  Id.  Were the Court to read Section 2.1 as broadly permitting both Salutary and its Customer Subscribers to engage in the actions prohibited in Section 2.1(b) and 2.1(h), the restrictions listed therein would be rendered superfluous.  See Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 785 (1st Cir. 2011) (recognizing that "[n]ot only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded" (quoting Starr v. Fordham, 420 Mass. 178, 191 (1995)); Baybank Middlesex v. 1200 Beacon Properties, Inc., 760 F. Supp.

8

957, 963 (D. Mass. 1991) (noting that "a contract must not, whenever possible, be construed so as to render any of its terms meaningless"). In the absence of any ambiguity, the Court must give plain meaning to the Agreement's terms. Moreover, this reading is not inconsistent with the strictures of Section 2.1(a) as that provision requires that a Customer Subscriber may only access and review ZoomInfo Data for its own individual, internal use. Section 2.1(a).[1] As Salutary concedes that its Customer Subscribers are "third-party redistributors" who are relicensing, reselling and redistributing ZoomInfo Data to their end customers, D. 11 ¶¶ 5, 20, in violation of Sections 2.1(a), 2.1(b) and 2.1(h), which prohibits Customer Subscribers from access and review of ZoomInfo Data for other than their own individual, internal use, and bars reproducing, distributing, displaying, selling, publishing, broadcasting or circulating ZoomInfo Data to any third-parties, D. 17-1 at 3, or modifying, licensing, bartering or selling any content provided by ZoomInfo, id., the Court concludes that ZoomInfo is likely to succeed on the merits of its breach of contract claim.[2]

Given the Court's reasoning above, the Court concludes that ZoomInfo is reasonably likely to succeed on its claim that the Customer Subscribers' use of ZoomInfo Data violated Section 2.1, thereby rendering Salutary in breach of contract and permitting ZoomInfo to terminate the Agreement under Section 4.2. Accordingly, Salutary's motion for preliminary injunction,

---

[1] That Section 2.1(a) also applies to Salutary does not negate the other access rights the Agreement gives to Salutary, not to Customer Subscribers.

[2] Salutary also relies upon extrinsic evidence relating to the parties' negotiations and intent, as well as the parties' course of dealing to support its motion and oppose that of ZoomInfo. See generally D. 23. Extrinsic evidence, however, is solely relevant in the face of an ambiguity in the contract, Bank v. Thermo Elemental Inc., 451 Mass. 638, 649 (2008) (noting that "extrinsic evidence may be used as an interpretive guide only after the judge or the court determines that the contract is ambiguous on its face or as applied"), which the Court does not find here and, therefore, does not reach this argument.

under which Salutary argues ZoomInfo is in breach of contract for terminating the Agreement, is unlikely to succeed on the merits. D. 9.[3]

### 2. *Irreparable Harm*

Although "[l]ikelihood of success is the main bearing wall of the four-factor framework," Ross-Simons of Warwick, Inc., 102 F.3d at 16, the likelihood of "irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief," Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004). To obtain a preliminary injunction, ZoomInfo must show a "significant risk of irreparable harm if the injunction is withheld," Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2002), that "cannot adequately be remedied through money damages alone." Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 242 (D. Mass. 2013), aff'd, 731 F.3d 6 (1st Cir. 2013). ZoomInfo "need not demonstrate that the denial of injunctive relief will be fatal to its business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc., 102 F.3d at 18. To analyze whether ZoomInfo made this showing, the Court considers certain "guideposts," such as whether its showing "possess[es] some substance" and is not "tenuous or overly speculative," and weighs the predicted harm "in tandem" with likelihood of success. Id. at 19. Solicitation and disclosure often lead to damage that it "would be practically impossible to calculate." Corp. Techs., 943 F. Supp. 2d at 243.

ZoomInfo argues that the value of ZoomInfo Data, which is ZoomInfo's chief product, is dependent on its exclusivity, as companies pay a significant sum to obtain a license to access the database. D. 14 at 21. Salutary has failed to abide by post-termination obligations and likely

---

[3] Considering this ruling on ZoomInfo's reasonable likelihood of success on the breach of contract claim, the Court need not reach its argument regarding its trade secrets claim.

continues to be in violation of the Agreement. Id. at 22. ZoomInfo argues that the unauthorized dissemination of ZoomInfo Data "will both lead to damages difficult to measure and harms not adequately compensable with money damages." Id. Given that the ZoomInfo Data loses value through lost exclusivity and may be sublicensed to ZoomInfo competitors without the imposition of Agreement restrictions, the distribution and sublicensing of ZoomInfo's data by third parties undermines the business itself. Accordingly, ZoomInfo's injury "is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc., 102 F.3d at 18. Weighing the alleged harms in tandem with ZoomInfo's likelihood of success on its breach of contract claim, id., the Court concludes that ZoomInfo has made an adequate showing of irreparable harm.

### 3. Balance of Harms and Public Interest

Turning to the balancing of harms, "[a]ny potential harm caused to [ZoomInfo] by a denial of its motion must be balanced against any reciprocal harm caused to [Salutary] by the imposition of an injunction." TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 32 (D. Mass. 2004). "The potential of lost profits alone does not constitute sufficient hardship for this inquiry." Dunkin' Donuts Franchised Restaurants LLC v. Wometco Donas Inc., 53 F. Supp. 3d 221, 232 (D. Mass. 2014) (citing Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 612 (1st Cir. 1988)). Here, according to Salutary, the relief that ZoomInfo seeks would be "catastrophic" and could potentially "put Salutary's business at serious risk, including the risk of putting Salutary out of business." D. 11 ¶¶ 36-37. Salutary claims "[t]he anonymized ZoomInfo data is essential for Salutary to meet its ongoing obligations of its Customer Subscriber contracts." Id. ¶ 37. As Salutary had already planned to phase out ZoomInfo Data by June 30, 2021, by which date the most recent amendment to the Agreement would expire and Salutary would have received

the final data feed from ZoomInfo, which was due at the end of March 2021, id. ¶ 38, Salutary argues pretermination would not leave them with enough time to replace the data it was supposed to receive, id. ¶¶ 40-41.

Salutary's claim of irreparable harm, however, flows from the premise that ZoomInfo, not Salutary, is in breach of the Agreement, an argument that the Court has concluded ZoomInfo is likely to win. That is, the relief that ZoomInfo seeks now flows from the Agreement that the parties freely entered into and now governs as ZoomInfo had a reasonable basis to terminate. Given ZoomInfo's likelihood of success on the merits and the irreparable harm that is inherent in the ongoing, unauthorized distribution and sale of its data, the balance of the interests weighs in favor of enforcing the post-termination rights of the parties under the Agreement as ZoomInfo seeks to do.

A preliminary injunction would still not be warranted unless there is also "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez, 353 F.3d at 120. "The public interest that is referred to in the test [is] the public's interest in the issuance of the injunction itself." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 45 n.8 (1st Cir. 2010) (emphasis omitted); see Ross-Simons of Warwick, Inc., 102 F.3d at 15 (reviewing "the effect (if any) of the court's ruling on the public interest"). There is a public interest in the upholding the terms of contracts entered into by the parties, or, at least, no friction between the injunction that the Court will allow ZoomInfo and the public interest.

Having considered all of the factors above, the Court allows ZoomInfo's motion for preliminary injunction as to its breach of contract claim. D. 13. The Court will enter a preliminary injunction Order that requires Salutary to comply with Section 4.4 of the Agreement.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS ZoomInfo's motion for a preliminary injunction, D. 13, and DENIES Salutary's motion for a preliminary injunction. D. 9.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge
